# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP591 |
| COMPLETE TITLE: | Oneida Seven Generations Corporation and Green Bay Renewable Energy, LLC, |
| | Plaintiffs-Appellants, |
| | v. |
| | City of Green Bay, |
| | Defendant-Respondent-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 353 Wis. 2d 553, 846 N.W.2d 33
(Ct. App. 2014 – Unpublished)

| | |
|---|---|
| OPINION FILED: | May 29, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 8, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Brown |
| JUDGE: | Marc A. Hammer |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ROGGENSACK, C.J. dissents. (Opinion Filed) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-respondent-petitioner, the cause was argued by *Ted A. Warpinski*, with whom on the briefs was *S. Todd Farris*, *Christopher M. Meuler*, *Joseph M. Peltz*, and *Friebert, Finerty & St. John, S.C.*, Milwaukee.

For the plaintiffs-appellants, the cause was argued by *Michael B. Apfeld*, with whom on the brief was *Eric J. Wilson*, *Dustin B. Brown*, and *Godfrey & Kahn, S.C.*, Madison.

An amicus curiae brief was filed by *Thomas D. Larson*, Madison, on behalf of the Wisconsin Realtors Association.

**2015 WI 50**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2013AP591
(L.C. No.  2012CV002263)

STATE OF WISCONSIN                 :         IN SUPREME COURT

Oneida Seven Generations Corporation and Green
Bay Renewable Energy, LLC,

       Plaintiffs-Appellants,

  v.

City of Green Bay,

       Defendant-Respondent-Petitioner.

**FILED**

**MAY 29, 2015**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals.  *Affirmed.*


¶1  ANN WALSH BRADLEY, J.   Oneida Seven Generations Corporation sought a conditional use permit to install a renewable energy facility in the City of Green Bay (the City).[1] Although the City initially voted to grant the permit, it subsequently voted to rescind the conditional use permit on the basis that it was obtained through misrepresentation. The court

---

[1] Green Bay Renewable Energy, LLC, also a party to this action, is a wholly owned subsidiary of Oneida Seven Generations Corporation.  We refer to them jointly as ("Oneida Seven").

of appeals determined that the City's decision that the permit was obtained through misrepresentation was not supported by substantial evidence and reversed.[2]

¶2 The City now seeks review of the unpublished decision of the court of appeals that reversed the order entered by the circuit court which had affirmed the City's decision to rescind. The City contends that the court of appeals incorrectly applied the substantial evidence standard by substituting its judgment for that of the City's Common Council.

¶3 Like the court of appeals we conclude that the City's decision to rescind the conditional use permit was not based on substantial evidence. In conducting a certiorari review to determine whether there was substantial evidence to support a decision, we consider the evidence in context. Considering the context, we determine that based on the evidence presented, the City could not reasonably conclude that the statements by Oneida Seven's representative to the City government regarding the proposed facility's emissions and hazardous materials, its stacks, and its technology were misrepresentations. Accordingly, we affirm the court of appeals.

I

¶4 A review of whether there is substantial evidence to support a determination that the permit was obtained through

---

[2] Oneida Seven Generations Corp. v. City of Green Bay, No. 2013AP591, unpublished slip op. (Wis. Ct. App. Mar. 25, 2014) (reversing order of the Circuit Court for Brown County, Marc A. Hammer, Judge).

misrepresentation generally requires a fact intensive analysis. This case is no exception. We begin by examining the nature of the proposed facility and the record established to support the initial grant of the conditional use permit.

¶5 Oneida Seven proposed a renewable energy facility that would take municipal solid waste and turn it into energy via a pyrolytic gasification system. It described the process as follows: municipal waste is delivered to the facility where it is sorted and inappropriate materials, such as tires and plastics, are removed. Then the waste is transferred into a pyrolytic converter, where it is heated and processed into gas. The remaining residue (such as ash) exits the unit. The gas is then cleaned in a venturi separator, before it is stored. Some of the gas (referred to as synthetic gas or "syngas") is used to fuel the system, the rest can be used to generate steam or electricity.

¶6 After meeting with Green Bay's Economic Development Department to discuss the permitting process and possible locations for its proposed facility, Oneida Seven submitted an application to the Plan Commission requesting a conditional use permit allowing it to place the facility on Hurlbut Street in Green Bay. The application was supported by a 149-page report on the facility.

¶7 The report includes proposed blueprints for the facility and artist's renderings of its exterior. It also contains photographs of a pyrolytic gasification unit with various parts labeled, including its "exhaust stack." In

addition to these illustrations, the report describes the various permits that would be required from the Wisconsin Department of Natural Resources (DNR) and the requisite reporting to and oversight by the DNR of the facility's emissions.

¶8 The report also contains a 50-page section entitled "Emissions." This section consists of two papers analyzing the impact of similar facilities on air quality. The papers identify possible emissions from conversion technologies, explain that they are significantly lower in amount than emissions from other types of facilities, and observe that the emissions from facilities using conversion technologies fall within local, state, federal, and international emission limits. The papers are followed by an appendix listing over 100 facilities throughout the world that are disposing and converting biomass (principally municipal solid waste) in the process of producing energy and/or fuels.

¶9 After reviewing Oneida Seven's submissions, the City's planning staff drafted a report to the Green Bay Plan Commission, recommending that it approve the request for the conditional use permit. The staff observed that the proposed use is an appropriate land use for the site, that the site is in a heavily industrial area separated from any residential uses by Interstate 43, and that there had been no inquiries or objections to the request as of the date of the report.

¶10 The Plan Commission considered the project at an open meeting on February 21, 2011. The CEO of Oneida Seven, Kevin

Cornelius, its engineer, and its project manager presented PowerPoint slides accompanied by an audio recording to the Commission which explained how the pyrolysis process works. After the recording concluded, Cornelius, the engineer, and the project manager took questions from the Commission.

¶11 During the question and answer session, a commissioner asked about what was in the gas after the gasification process was complete. Mr. Cornelius responded that the gas was cleaned and toxins would be removed from it. The same commissioner then acknowledged the emissions research Oneida Seven had provided and questioned the procedures employed by a site in California. The engineer responded that California's site chose a system based on similar technology. Like that system, the new system Oneida Seven would be using meets all emission requirements.

¶12 Another commissioner asked if there were other communities using this technology. The engineer and Cornelius replied that this would be the first community in Wisconsin to use this technology, but other industries use different versions of gasification systems.

¶13 Commissioner Wiezbiskie asked about the system's output. Mr. Cornelius or the engineer replied that the process would create ash that would be tested and reused if test results were appropriate.[3] Then, after referring to the comprehensive

---

[3] It is unclear from the recording whether it is Cornelius or the engineer who is speaking at this point in the meeting. The meeting minutes attribute these statements to Cornelius, but the parties indicated that the meeting minutes were inaccurate at times in identifying the speaker.

emissions report Oneida Seven had submitted, Commissioner Wiezbiskie asked about the ash and the syngas that the process would produce. Mr. Cornelius or the engineer responded that the emissions would be taken out in the gasification process and the syngas would be cleaned.

¶14 Again referencing the emissions report, Commissioner Wiezbiskie sought further clarification about what toxins would be in the ash. Either Cornelius or the engineer responded that the toxins would be removed from the ash and that they would be the only by-product from the process. He further explained that the emissions would meet EPA and DNR standards.

¶15 After the question and answer session, the Plan Commission voted unanimously to recommend approval of the conditional use permit. Their recommendation suggested that a number of conditions be placed on the permit. These included the requirement that the facility comply with all municipal regulations and the requirement that the facility comply with federal and state regulations governing air and water quality.

¶16 The Common Council took up Oneida Seven's request for the conditional use permit on March 1, 2011. Shortly after the project was brought to the floor, one of the aldermen clarified that if it got approved, the Department of Energy, the DNR, and the EPA would also be reviewing the project: "So there's a bunch of scientists looking at this, to check for safety. What we're doing here tonight is to say is this the right part of Green Bay for something like this to go into. And that's all."

6

¶17 The Common Council viewed the same PowerPoint presentation that Oneida Seven had played for the Plan Commission. During the presentation, Cornelius explained the gasification process, noting that there would be no emissions coming out of one "portion of the system," but there would be "emissions from the burner," which meet emission standards. He observed that there would be no smokestacks, adding, "for those of us in Green Bay we know that that means." Mr. Cornelius also stated that "gasification technology is not new." He explained how in developing this project, they had gone around the country looking at different systems, and ultimately decided on a system they had seen in California.

¶18 Then, Cornelius and the project manager answered questions from the Council. Members of the Council asked about tax exemptions, whether the land could be placed into a trust, and where Oneida Seven would be obtaining the waste material that the plant would process. One alderman recognized that although there would not be stacks, there would be an exhaust output, and asked if the exhaust would be clean. Mr. Cornelius responded "yes." The Council also heard testimony from an independent consulting engineer in support of the project. He gave detailed information about the various emissions gasification systems produce. After a lengthy discussion of the Tri-County Agreement and tipping fees, the Council voted ten to one to approve the

7

conditional use permit with the conditions recommended by the Plan Commission.[4]

¶19 In accordance with the conditions of the permit, Oneida Seven applied for the various city, state, and federal permits it would need for the project. The City's Division of Safety and Buildings found the plans to be in conformance with applicable laws and regulations and issued a building permit for the project. Likewise, the DNR approved Oneida Seven's application for an air permit, determining that the project met statutory requirements.[5] The United States Department of Energy (DOE) also reviewed the project and determined that it would not significantly affect the quality of the human environment.

¶20 Despite concerns voiced by some members of the public, the DNR granted a final construction permit for the project. The permit indicated that the project would be required to have multiple "stacks."[6] The permit further required Oneida Seven to

---

[4] The members of the Council voting in favor were: Ald. Deneys, Ald. Wiezbiskie, Ald. DeWane, Ald. Theisen, Ald. Kocha, Ald. Haefa, Ald. Dorff, Ald Wery, Ald. Zima, and Ald. Danzinger. Alderman Nicholson voted against granting the permit.

[5] The record indicates that Oneida Seven paid approximately $17,350 in permit fees to the DNR and $11,405 in permit fees to the City.

[6] Initially, the permit indicated the stacks would be up to 60 feet tall. However, after the City informed Oneida Seven that under municipal regulations the stacks could not exceed 35 feet in height, Oneida Seven submitted a request to the DNR to modify the permit so that the highest stack would be 35 feet tall, reaching only 3 feet over the roofline of the facility. That request was granted.

test emissions for a number of specified pollutants and notify the DNR immediately if results exceeded certain levels.

¶21 Additional members of the public joined those who previously had voiced their concerns and complained to the Common Council. Their complaints primarily focused on the stacks and emissions referenced in the building permit. One individual observed that the stacks were not on the City plan. Another individual read a letter from the Midwest Environmental Advocates which asserted that the conditional use permit should be rescinded due to misrepresentations.

¶22 Thereafter, the Common Council voted to direct the Plan Commission to hold a hearing to determine whether the conditional use permit had been obtained by misrepresentation. The published notice for the hearing stated its purpose more specifically: "to determine if the information submitted and presented to the Plan Commission was adequate in order to make an informed decision whether or not to advance the Seven Generation conditional use permit, the CUP that was recommended."

¶23 The Plan Commission held the hearing on October 3, 2012. It accepted numerous submissions from the public and permitted representatives from Oneida Seven, Council members, and members of the public to testify. Oneida Seven submitted various documents, including the copies of the DNR Environmental Analysis, the DNR's response to public comments, the original and revised DNR air permits, the DOE Finding of No Significant Impact, and the DOE Final Environmental Assessment.

9

¶24 Mr. Cornelius also spoke on Oneida Seven's behalf. Referencing the substantial documentation Oneida Seven had provided with its initial application, he testified that there had been enough information before the Commission for it to make a decision on the conditional use permit. He denied that he said the entire facility would have no emissions and emphasized that his earlier comments were regarding certain portions of the gasification process. He asserted that the City was well aware that the facility would have emissions.

¶25 With respect to the comments about stacks in his earlier presentation, Cornelius explained that "stacks" are different from "smokestacks." He stated that he had used the term smokestack as a layman's term for those stacks associated with coal-burning plants that are several hundred feet high and twenty to thirty feet wide. In contrast, the "stacks" at the proposed facility are exhaust pipes that will be approximately 26 inches wide and 35 feet tall (a mere 3 feet over the roofline of the building). The DNR's definition of stack is very broad, including even an air vent. According to Cornelius, they filled out the DNR application indicating that the facility would have stacks, not smokestacks, as the exhaust pipes fit the DNR's definition of the term.

¶26 Other individuals spoke on behalf of the project as well. An environmentalist testified that the project was a good transition strategy to get to zero waste. Alderman Kocha testified that she and other Council members had met with the neighborhood association and reviewed the tape of the session

where they had voted to approve the permit. After reviewing the tape, they did not think Oneida Seven had lied. Similarly, the independent consulting engineer testified that the City had not been misled. He had made it clear at the Common Council meeting on March 1, 2011, that the facility would have emissions.

¶27 There were also individuals who spoke against the project at the hearing. They complained that they and the commissioners and Council members were told that there would be "zero pollution, zero emissions, zero smoke stacks, zero hazardous materials" and that those were misrepresentations. Some indicated they thought the project would be bad for the public health, contending that when you burn tires and medical waste it is just common sense that "you don't just put all that in there and then nothing comes out." Others indicated the project was too rushed. Still others were just generally against it, noting the odor it would produce, complaining about the lack of neighborhood notification, and asking other questions about the project, such as why the Oneida tribe was not building the facility on its own land.

¶28 After the testimony concluded, the members of the Plan Commission debated whether they had received adequate information to make an informed decision to recommend approval of the conditional use permit. Several of the comments in this debate were directed at concerns the public had raised.

¶29 In response to the comments about the stacks not appearing in the preliminary drawings of the facility, the commissioners observed that at the time an applicant is seeking a

11

conditional use permit, not all of the details have been decided; applicants do not want to spend a lot of money on something before it has been approved. Accordingly, the Plan Commission does not expect to see finalized architectural drawings at that point in time. As for the citizens' concerns over what the proposed facility would be using as feedstock, one commissioner pointed out that hazardous waste, infectious waste, tires, plastic, and electronics would not be used in the gasification process.[7]

¶30 The commissioners also recognized that they were not experts and neither were most of the individuals who had testified that night. They stressed that they rely on the experts at the DNR and the DOE, and that was why they put a condition in the conditional use permit requiring Oneida Seven to get approvals from those bodies. The commissioners further stated that they had been aware that there would be emissions from the facility and they had been aware that the facility would have vents.

¶31 The commissioners unanimously agreed that they had had adequate information to reach a decision on the conditional use permit, that they had not been misled, and that Oneida Seven had not made misrepresentations. The Commission relayed these findings to the Common Council in a report.

---

[7] "Feedstock" refers to the waste that will go into the pyrolytic gasification system to be converted into energy.

¶32 The Common Council considered the Plan Commission's findings at a meeting on October 16, 2012. Alderman Wiezbiskie moved for the Council to approve the decision of the Plan Commission. The motion did not pass. Then, Alderman Sladek moved to rescind the conditional use permit. He provided four bases for his motion. First, he asserted Cornelius had made false statements in response to questions about the project:

> Number one, the chief executive officer of Seven Generations Corporation, Kevin Cornelius, made untruthful statements before the city governmental bodies while seeking the conditional use permit for the gasification project. These false statements were made in response to questions or concerns related to the public safety and health aspects of the project and the project's impact on the city's environment.

Second, Alderman Sladek determined that Cornelius's untruthful statements were clear and left no impression of doubt or uncertainty:

> Number two, the statements made by Kevin Cornelius were plain spoken statements, they contained no equivocation, they left no impression of doubt or uncertainty, his words were intended to influence the actions of the bodies he was addressing.

Third, Alderman Sladek maintained that Cornelius knew his statements were false:

> Number three, Kevin Cornelius knew his statements were false, he was not a new, or uninformed member of the Seven Generations Organization, he was the chief executive officer, and had been involved throughout the project's development, and was therefore knowledgeable about the pilot work, the process and the equipment, and the materials that would be used, the nature of the byproducts and chemicals released. He understood the role that he accepted as a spokesperson for seven generations for that project

13

and he had every opportunity to say 'I don't know' or 'I can't answer that' when the questions were put to him.

Alderman Sladek's fourth basis for the motion was that he believed that Cornelius's untruthful statements were on matters of high importance:

Number four, the subject matter of the questions put to Kevin Cornelius was of very high importance. On the subject of emissions, the documents submitted by Seven Generations in applying for the permit were references to other plants using a variety of technologies, equipment, and feedstock. Commissioners were rightfully interested in this project, not what happened at other projects. That's why they asked the questions they did. And when they asked about emission, and chemicals, and hazardous materials at this project, Kevin Cornelius provided false information.

The Mayor called for a vote on the motion to rescind the conditional use permit "for the reasons [Sladek] stated." The motion passed by a vote of seven to five.[8]

¶33 Oneida Seven filed for an administrative appeal under Wis. Stat. §§ 68.08, 68.10 and 68.11, requesting review and a

---

[8] There was a significant change in the makeup of the Common Council between the time the Council initially approved the conditional use permit and the time that the Council voted for rescission. The Council members who voted to rescind the conditional use permit were: Ald. Boyce, Ald. Burnette, Ald. (Tim) Dewane, Ald. (Tom) DeWane, Ald. Nicholson, Ald. Sladek, and Ald. Steuer. Five of these individuals were new members of the Council. The members who voted against rescinding the conditional use permit were: Ald. Danzinger, Ald. Kocha, Ald. Moore, Ald. Warner, and Ald. Wiezbiskie. Two of these individuals were new members. Only one who had originally voted to grant the conditional use permit changed his vote to rescind it.

hearing. The City denied the request, determining that the hearings before the Plan Commission and the Common Council substantially complied with Wis. Stat. § 68.11 and met constitutional standards and protections.

¶34 Next, Oneida Seven sought certiorari review from the circuit court. It asserted that the City's decision to rescind its conditional use permit was arbitrary and not supported by substantial evidence. The circuit court rejected Oneida Seven's arguments.

¶35 On appeal, Oneida Seven again argued that the City's decision to rescind its conditional use permit was arbitrary and not supported by substantial evidence.[9] In response, the City contended that Oneida Seven had made multiple misrepresentations that supported its decision to rescind the conditional use permit, including: that the facility would have no emissions, that its char could be reused, that the facility would not have smokestacks, and that the process was not new technology.

¶36 Describing the City's actions as "[f]ickle and inconstant," the court of appeals agreed with Oneida Seven.

---

[9] Oneida Seven also argued that the City could not revoke the conditional use permit because Oneida Seven had obtained a vested right to it. The court of appeals did not address this argument because it ruled in favor of Oneida Seven on other grounds. Oneida Seven Generations Corp, No. 2013AP591, ¶18 n.4. Oneida Seven made a similar argument regarding vested rights to this court. The City responded that Oneida Seven could not have gained vested rights in the permit because it was approved based on misrepresentations. Like the court of appeals, we need not address these arguments because the substantial evidence issue is determinative.

15

Oneida Seven Generations Corp. v. City of Green Bay, No. 2013AP591, unpublished slip op., ¶22 (Wis. Ct. App. Mar. 25, 2014). First, the court determined that the Common Council had failed to give the basis for the City's decision to revoke the permit in that it did not identify the alleged misrepresentations Cornelius made. Id., ¶¶24-27. According to the court of appeals, this failure alone makes the City's action appear to be the product of "unconsidered, wilful or irrational choice, and not the result of the 'sifting and winnowing process.'" Id., ¶27 (quoting Robertson Transp. Co. v. PSC, 39 Wis. 2d 653, 661, 159 N.W.2d 636 (1968)).

¶37 Next, the court considered the allegedly false statements identified in the City's brief. It determined that none of them constituted substantial evidence of misrepresentation. Id., ¶29. It explained that the City's assertion that there were misrepresentations that the facility would be a closed system, which would produce no chemicals or hazardous materials, was untenable because the statements were all made in response to questions about the pyrolysis process, not the facility as a whole. Id., ¶31.

¶38 Further, the court of appeals concluded that the statement that the char byproduct could be reused was not false. Id., ¶32. It observed that the DNR's environmental analysis states that the char could be reused as a beneficial product subject to approval, and suggested that it "may be suitable for [] use as concrete additives, flowable fill material, and

16

aggregate for sub-base of roads and stabilization for landfill cover if it meets certain waste characteristics." Id.

¶39 In regards to the "no smokestacks" comment, the court acknowledged that the final design of the facility includes vents that are just a few feet above the building's roof and none of Oneida Seven's statements could reasonably be interpreted as a promise that the facility would have no stacks or vents. Id., ¶¶35-37.

¶40 Lastly, the court concluded that the statements that pyrolysis and gasification were not new technology were accurate. Id., ¶¶38-39. The court based this conclusion on the DOE report, which states that pyrolysis and gasification of municipal solid waste is used all over the world and includes a list of 27 facilities worldwide that are currently using or planning to use municipal solid waste as the primary feedstock. Id., ¶39. Accordingly, the court of appeals reversed the circuit court.

II

¶41 We are asked to consider whether the City's decision to rescind Oneida Seven's conditional use permit was supported by substantial evidence. There is a presumption that the City's decision is valid. Edward Kraemer & Sons v. Sauk Cnty. Bd. of Adjustment, 183 Wis. 2d 1, 8, 515 N.W.2d 256 (1994). On certiorari review, our inquiry is limited to: "(1) whether the municipality kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will

17

and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question." Ottman v. Town of Primrose, 2011 WI 18, ¶35, 332 Wis. 2d 3, 796 N.W.2d 411 (internal citations omitted).

¶42 Our focus is on the fourth inquiry. We do not review the judgment or findings of the circuit court but rather we review the record of the City to whom certiorari is directed. State ex rel. Harris v. Annuity & Pension Board, 87 Wis. 2d 646, 651, 275 N.W.2d 668 (1979); see also Edward Kraemer & Sons, 183 Wis. 2d at 8 (observing that this court reviews the record before the Board).

III

¶43 We begin with an overview of the substantial evidence standard. "'Substantial evidence' is evidence of such convincing power that reasonable persons could reach the same decision as the board." Clark v. Waupaca County Bd. of Adjustment, 186 Wis. 2d 300, 304, 519 N.W.2d 782 (Ct. App. 1994); see also Sills v. Walworth County Land Mgmt. Cmte., 2002 WI App 111, ¶11, 254 Wis. 2d 538, 648 N.W.2d 878 ("Substantial evidence means credible, relevant and probative evidence upon which reasonable persons could rely to reach a decision.").

¶44 Although substantial evidence is less than a preponderance of the evidence, Smith v. City of Milwaukee, 2014 WI App 95, ¶22, 356 Wis. 2d 779, 854 N.W.2d 857, it is "more than 'a mere scintilla' of evidence and more than 'conjecture and speculation.'" Gehin v. Wis. Group Ins. Bd., 2005 WI 16, ¶48, 278 Wis. 2d 111, 692 N.W.2d 572. Further, "mere

18

uncorroborated hearsay . . . does not constitute substantial evidence." Id., ¶53 (internal citations omitted); see also Williams v. Hous. Auth. of Milwaukee, 2010 WI App 14, ¶19, 323 Wis. 2d 179, 779 N.W.2d 185 (determining that agency decision based solely on uncorroborated hearsay could not stand). We acknowledge, however, that the weight to accord the evidence lies within the discretion of the municipality. Sills, 254 Wis. 2d 538, ¶11.

¶45 In determining whether the substantial evidence test is met, a court conducting a certiorari review should "tak[e] into account all the evidence in the record." State ex rel. Palleon v. Musolf, 120 Wis. 2d 545, 549, 356 N.W.2d 487 (1984). In other words, a reviewing court should consider the context of the evidence when determining whether it supports a municipality's action. See Copland v. Wisconsin Dep't of Taxation, 16 Wis. 2d 543, 554, 114 N.W.2d 858 (1962).

¶46 This premise is illustrated by Wagner v. Industrial Comm'n, 273 Wis. 553, 79 N.W.2d 264 (1956). There, the court considered whether the Industrial Commission's determination that an employee did not sustain a permanent total disability was supported by the record. In upholding the Commission's determination, the circuit court had relied on doctors' statements that "the man's 'condition continued some time into August of 1952'; that his hands were 'normal' at that time . . . [and] that the man was 'completely recovered' by August of 1952." Id. at 564.

¶47 On appeal, the Supreme Court determined that these statements "were merely isolated statements taken out of context which are completely explained by other testimony given by these same physicians." Id. at 565. It observed that "[t]he trial court completely overlooked the testimony that all three of these doctors considered that [the employee's] skin had become sensitized due to his employment" and that the doctors "testified that [the employee] should never again return to his former employment." Id. at 564. Thus, based on the record as a whole, the court determined that the Commission's decision was not supported by the evidence. Id. at 565.

¶48 Having explained the substantial evidence standard, we turn now to the City's decision. Although the City did not issue a formal written decision, municipal administrative decisions need not be in writing. See State ex rel. Harris v. Annuity & Pension Bd., 87 Wis. 2d 646, 660, 275 N.W.2d 668 (1979) (the section of the state Administrative Procedure Act requiring administrative decisions to be in writing applied only to hearings of state agencies). "[A] written decision is not required as long as [the City's] reasoning is clear from the transcript of the proceedings." Lamar Cent. Outdoor, Inc. v. Bd. of Zoning Appeals, 2005 WI 117, ¶31, 284 Wis. 2d 1, 700 N.W.2d 87.

¶49 Additionally, a detailed or explicit explanation of the City's reasoning is not necessary. The decision need only contain enough information for the reviewing court to discern the basis of the City's decision. State ex rel. Harris, 87 Wis.

20

2d 646, 661; see also Valadzic v. Briggs & Stratton Corp., 92 Wis. 2d 583, 591, 286 N.W.2d 540 (1979) ("A general finding by the Department implies all facts necessary to support it. A finding not explicitly made may be inferred from other properly made findings and from findings which the Department failed to make, if there is evidence (or inferences which can be drawn from the evidence) which would support such findings.").

¶50 In this case, the basis of the City's decision to revoke the conditional use permit can be discerned from the recording of the Common Council's October 16, 2012 meeting and the recording of the February 21, 2011 Plan Commission meeting. The motion to rescind the conditional use permit was explicitly based on the reasons provided by Alderman Sladek: 1) Cornelius made untruthful statements to city governmental bodies in response to questions related to the public safety and health aspects of the project and the project's impact on the city's environment; 2) those statements were clear and left no impression of doubt or uncertainty; 3) Cornelius knew his statements were false; and 4) the subject matter of the questions was of high importance.

¶51 Although the Common Council did not quote the specific statements that it determined were untruthful, Alderman Sladek's descriptions are sufficient to identify them. He described them as Cornelius's responses "to questions or concerns related to the public safety and health aspects of the project and the project's impact on the city's environment" and, more specifically, Cornelius's responses to commissioners "when they

21

asked about emission, and chemicals, and hazardous materials at this project."[10]

¶52 It appears that the intentional misrepresentations to which Alderman Sladek was referring were Cornelius's statements at the February 21, 2011 Plan Commission meeting. This inference is supported by the fact that when the Common Council referred the concerns about the conditional use permit to the Plan Commission for a hearing, the issue was "whether the information submitted and presented to the Plan Commission was adequate for it to make an informed decision whether or not to advance the [CUP] that was recommended." Consistent with that inference, in their arguments over whether there were misrepresentations, the parties referred solely to statements made during the February 21, 2011, hearing before the Plan Commission.[11]

---

[10] Admittedly, it is a close call whether Sladek's statements are sufficient. Although the court of appeals determined otherwise, we conclude that Sladek's description of the alleged misrepresentations made by Cornelius is sufficient because we can discern which statements Sladek was referencing by closely examining the record. Accordingly, we need not address the City's arguments that the court of appeals should have remanded the case for a fuller explanation of its decision.

[11] Contrary to the dissent's assertion, we are not reviewing the Plan Commission's decision. Our review is focused on the decision of the Common Council. As discussed above, the Common Counsel determined that Cornelius intentionally made misrepresentations to the Plan Commission. Thus, an analysis of whether the Common Council had a substantial basis for that determination necessarily includes what statements were made to the Plan Commission and what, if any, information in the record shows that those statements were false.

¶53 Accordingly, we discern which statements the Common Council determined were intentional misrepresentations by looking at the questions the Plan Commission posed to Cornelius and his responses at the February 21, 2011 Plan Commission meeting. The parties group the statements into three categories: statements that the facility will have no emissions or hazardous materials, statements that there will be no stacks, and statements that this is not new technology.[12] We address each category in turn, assessing whether there is substantial evidence that the statements were misrepresentations by Cornelius made with the intent to mislead the City.

¶54 Addressing emissions and hazardous materials, the first question from the commissioners on this topic asked what would be left over once the gasification process was complete:

---

[12] We observe that the City's brief relies solely on the meeting minutes from the Plan Commission's February 21, 2011, meeting to identify the alleged misrepresentations. However, as discussed above, our analysis takes into account all of the evidence. Here, Cornelius's statements were recorded. The recording is more informative of his actual statements than are the meeting minutes, which provide only a summary. Thus, contrary to the City, we rely on the actual statements made by Cornelius, rather than the summary of those statements in the minutes.

Uncovering the actual statements required the court to review the hours of audio-recording in the record. Counsel are reminded that it is incumbent upon them to provide the court with a sufficient record of the proceedings that we are to review. In this case, that should have included transcripts of the proceedings at issue. However, no transcripts of the February 21, 2011 Plan Commission Hearing, the March 1, 2011 Common Council meeting, or the October 16, 2012 Common Council meeting were provided.

"there seems to be some concern about some of the——once the gasification is complete, about some of the——some hazardous materials being left over, and I wondered if you would address that."

¶55 Mr. Cornelius's response was limited to what would be in the syngas after the gasification process was complete and what would be in the ash: "Um, there is no hazardous material. What happens is there is some ash that comes out of the deposit——the system is closed, so there is no oxygen, so once it's baked, all the gas is taken out and it's run through what's called a venturi scrubber, so it takes out any kind of harmful toxin that would be, that might be in the gas. . . . the ash that comes out is inert and can be dumped in a landfill or it can be dumped and mixed with cement as a road base."

¶56 The commissioner followed-up on his initial question, asking if the emissions identified in the report would be in the ash: "In the report, under emissions, you refer to some particulate matter, also hydrogen chloride, nitrogen oxide, sulfur dioxide, mercuries and dioxins. Now this is all in your ash?" Either Cornelius or the engineer responded that chemicals are not in the ash: "That's all taken out in the process." The commissioner then asked if the chemicals would be in the syngas that the facility produces: "And it's not in the syngas?" Mr. Cornelius or the engineer responded "No, it's all scrubbed out."

¶57 The commissioner later asked again whether certain substances identified in the report would be in the ash: "I guess, there's some particulate but the rest is dioxins and

24

mercuries and all that. Where is that stuff, is it in the ash, when it's done?"

¶58 Mr. Cornelius or the engineer reiterated that those substances are not in the ash and stated that those are the only byproducts from the process: "It's actually, it gets taken out, that's the only byproduct we have. It's through the scrubbers and the filters." Mr. Cornelius or the engineer further stated that the ash, if tested appropriately, could go into organic farming or be used in asphalt: "they've been tested, can actually go right into [] for organic farming. I can sell it right to asphalt companies, they use that in asphalt."

¶59 Next, the commissioner asked whether at this point in the gasification process the substances identified are removed: "So all this stuff is now removed?" Either Cornelius or the engineer responded that at this point the substances would be removed and further informed the commissioner that studies of other facilities had been unable to find the substances:

> If there's anything present. . . . [T]here was a study done in this area in southern [sic] municipal waste. And in, that even states they could not find mercury, could not find a lot of these things that's not present. But in these reports, it's just stating from other sources that these are possible, but in this plant that there will be none.

After again agreeing with the commissioner's statement that there would be no dioxins or mercury in the ash, Cornelius added that "[t]he emissions that will be going out will be acceptable. And there won't be any of the chemicals that you mentioned."

¶60 Although numerous individuals at the public hearing accused Cornelius of stating that the facility itself would have no emissions or hazardous substances, and that the entire facility was a closed-loop system, none of these accusations are supported by the record. As illustrated above, the context of Cornelius's statements reveals that his statements about emissions, hazardous materials, and the system being closed were not about the facility as a whole. Rather, his statements were in response to specific questions about what would be in the syngas, what would be in the ash, and what would be present and happening at specific phases of the process.

¶61 In addition to a lack of any statement that the facility would have no emissions, the record reveals that Cornelius actually stated that there would be emissions in amounts that would meet EPA and DNR standards. Specifically, he stated that "it will always be under the EPA and DNR standards" and that "the emissions that will be going out will be acceptable."

¶62 The fact that there would be emissions from the facility was also conveyed to Commission members in Oneida Seven's written submission. In an approximately 50-page section titled "Emissions," the submission describes in detail possible emissions and what has occurred at other plants using pyrolysis and gasification technology. It states that "[t]he output products of pyrolysis and gasification reactors can contain a variety of potential process and air pollutants that must be controlled prior to discharge into ambient air. These include

26

particulate matter (PM), aerosols or tars, oxides of nitrogen (NOx), oxides of sulfur (SOx), dioxins and furans, hydrocarbon (HC) gases, multiple metals, and carbon monoxide (CO)."

¶63 Commission members specifically acknowledged the emissions section of Oneida Seven's submission during the February 21, 2011 hearing, indicating that they were well aware of it. For example, one commissioner stated: "I appreciate very much the submission of a number of studies that are reassuring that this in fact is less polluting than other processes for taking care of waste, including landfill itself." Another stated: "You go into the emissions section——oh, and let me also thank you for this comprehensive report that you gave to us."

¶64 The Commission further indicated its awareness that the facility would have emissions by including in the conditional use permit a requirement that the facility comply with "Federal and State regulations and standards related to the proposed use including air and water quality." (Notably absent from the conditional use permit was a requirement that the facility have no emissions.) Consistent with this record, the report of the Plan Commission acknowledged that it had been aware that the project would have emissions.

¶65 There is no indication in the record that the statements Cornelius actually made (that the scrubbers remove the harmful toxins from the syngas and that the dioxins and mercury would not be in the ash, which could be reused for beneficial purposes) were false. Opponents of the project who testified at the October 2, 2012 hearing referred to the DNR

permit as support for their assertions that Cornelius lied. However, that permit provides no support for their position. It identifies "facility-wide" potential emissions, it does not state that there would be toxins in the syngas or dioxins or mercury in the ash.

¶66 Contrary to the allegations, the documents from the DNR that are in the record support Cornelius's statement that the venturi scrubber would remove toxins from the syngas. A summary from a DNR hearing on the proposed facility states that the syngas will be cleaned: "The Department has confirmed that the engineering design for the proposed facility is that all syngas generated by the retort ovens, including startup and shutdown, will pass through the gas cleaning system." The summary then explains that the DNR will require compliance with that process: "To ensure that this is how the proposed facility will be built, the permit has been amended to include a requirement that the flare only combust cleaned syngas."

¶67 Likewise, the DNR Pollution Control Permit provides that "[a]ll syngas generated by the retort ovens, including during startup, shutdown or malfunction, shall pass through a gas conditioning system to remove particulates, condensable organics, moisture, sulfur compounds and other contaminants."

¶68 The Department of Energy made similar statements as part of its review. For example, the DOE Final Environmental Assessment explains that "[g]ases pulled from the pyrolytic converter would first go through a venturi scrubber or separator. This step washes out carbon particles that may have

28

traveled with the gas from the converter and removes some of the condensable gases . . . From the venturi scrubber, the gas would go through a condenser to remove the rest of the condensable gases." The Final Environmental Assessment further confirms that "syngas is scrubbed of contaminants prior to combustion and discharge."

¶69 Mr. Cornelius's statements about the ash being put to beneficial uses are also supported by the DNR and DOE materials. The summary of the DNR hearing indicates the possibility that the ash could be reused, depending on how it tests. It states: "Oneida Energy's disposal options [for the char/ash] include: non-hazardous waste to an approved landfill, hazardous waste to an out-of-state landfill, and beneficial use to a purchaser. All these options are based on char test results."

¶70 Likewise, the DOE Finding of No Significant Impact indicates that "[p]rovided the by-products do not exceed thresholds of pollutants, they could be used for beneficial purposes." The DOE Final Environmental Assessment also indicates that "depending on the specific constituent in the waste product, it is expected that at least a portion of the waste stream could be usable as a concrete additive or as road bed material." In sum, we could not find evidence in the record on which a reasonable person could rely to find that Cornelius's statements about emissions and hazardous materials were misrepresentations.

¶71 We turn now to the second category of alleged misrepresentations: the statements Cornelius made about stacks.

29

The first reference to smokestacks was included in the recorded presentation Cornelius played for the Plan Commission during the February 21, 2011 hearing. It stated: "As you can see, there are no smokestacks such as those associated with coal powered power plants." Then, during the question and answer portion of the hearing, in response to Alderman Wiezbiskie's question "No smokestack?" either Cornelius or the engineer replied "No." Opponents of the facility asserted that this statement was a lie because the DNR permit indicated that the project would have "stacks."

¶72 Again, we focus on context. In terms of the DNR permit, it is important to acknowledge that the DNR defines "stack" very broadly, as "any device or opening designed or used to emit air contaminants to the ambient air." Wis. Admin Code NR § 400.02(147).[13] There is no indication that Cornelius's use of the term smokestack during his public presentation to the Plan Commission was a reference to the technical term "stack" as defined by the DNR.

¶73 To the contrary, it appears that Cornelius's statement was reiterating the statement made in the recorded presentation. It had used the term smokestacks as a reference to the stacks

_____

[13] Alderman Wizbiskie explained that "a stack in our nomenclature basically could be a vent off of a plumbing grid. In other words, you have a vent venting the plumbing piping. A stack could be what we have in our homes. I have a stack that comes off my kitchen hood and exhaust to the outside. I have a stack in my bathroom that vents out through the wall."

present at the coal powered power plants. As Cornelius explained, those stacks are several hundred feet high and twenty to thirty feet wide. In contrast, the "stacks" at the proposed facility are exhaust pipes that will be approximately 26 inches wide and 35 feet tall, rising only 3 feet above the roofline of the facility.[14] Even the commissioners declared that they were aware the facility would have such vents.

¶74 If the City had not wanted such vents, it could have added that as one of the conditions to the conditional use permit. Instead, it conditioned the permit on compliance with municipal regulations, which permit stacks up to 35 feet above ground level. Given this context, it would be unreasonable to conclude that Cornelius's statement that there would be no smokestacks was an intentional misrepresentation.

¶75 Lastly, we turn to the third category of alleged misrepresentations: statements that this is not new technology. At the Plan Commission hearing on February 21, 2011, the recorded presentation stated that "this technology is not new, nor is it experimental." Then, during the question and answer session, one commissioner asked "are any other local communities

---

[14] We acknowledge that there were also some arguments that the initial drawings of the facility were misleading as they did not show the stacks. However, this is not one of the misrepresentations on which the Common Council based its decision. Its decision clearly referred to statements made by Cornelius in response to questions about the facility. In any event, the drawings were preliminary. The commissioners stated that they were aware the drawings were preliminary, that they "are used to people coming in with unfinished sketches."

using this technology?" Mr. Cornelius responded that "in the state of Wisconsin, we'd probably be the first one." He further noted that "there are other biogas plants."

¶76  There is nothing in the record to suggest that either of Cornelius's limited statements was incorrect. It is undisputed that there is not another facility in Wisconsin converting municipal solid waste into energy via a pyrolytic gasification system. Similarly, no one refutes Cornelius' statement that there are asserts that there are other biogas plants. Indeed, several are identified in Oneida Seven's submission.

¶77 Consistent with that submission, the DOE report acknowledges that "[t]he pyrolysis and gasification of [municipal solid waste] is used all over the world." It likewise acknowledges that "[t]oday there are numerous successful plants in operation around the world and in the United States that utilize various forms of pyrolysis to process different resources to produce energy." It specifically points to a facility in California that used municipal solid waste as its feedstock.

¶78 Although members of the public testified that they could not find other facilities using this exact technology on municipal solid waste that were operating on a commercial scale, Cornelius did not tell the Plan Commission that such a facility existed. Given this context, it would be unreasonable to conclude that Cornelius's statements about the technology the facility would use were intentional misrepresentations.

32

¶79 The above review reveals that the City's decision to rescind the conditional use permit was not supported by substantial evidence. Despite the City's claim that Cornelius made intentional misrepresentations to government entities in response "to questions or concerns related to the public safety and health aspects of the project and the project's impact on the city's environment," we could find no such misrepresentations in the record. Thus, Oneida Seven has successfully rebutted the presumption that the City's decision was valid.

¶80 Our view of the record is buttressed by the Plan Commission's findings regarding Cornelius's statements. We acknowledge that the Common Council is not required to adopt those findings. However, where the question is whether the Plan Commission was misled and the Plan Commission unanimously finds that it was not, we have difficulty reaching another conclusion.

IV

¶81 In sum, we conclude that the City's decision to rescind the conditional use permit was not based on substantial evidence. In conducting a certiorari review to determine whether there was substantial evidence to support a decision, we consider the evidence in context. Considering the context, we determine that based on the evidence presented, the City could not reasonably conclude that the statements by Oneida Seven's representative to the City government regarding the proposed facility's emissions and hazardous materials, its stacks, and

its technology were misrepresentations.  Accordingly, we affirm the court of appeals.

*By the Court.*— The decision of the court of appeals is affirmed.

¶82 PATIENCE DRAKE ROGGENSACK, C.J. *(dissenting).* The Common Council of the City of Green Bay found that representatives of Oneida Seven Generations Corporation misrepresented material facts to the Common Council when it obtained a conditional use permit to construct and operate a biomass gasification facility. On certiorari review, the Common Council's factual findings are sustained if any reasonable view of the evidence supports them. Kapischke v. Cnty. of Walworth, 226 Wis. 2d 320, 328, 595 N.W.2d 42 (Ct. App. 1999). The majority opinion refuses to follow this and other long-established legal principles that apply to certiorari review of a common council decision and thereby errs.

¶83 In this regard, the majority opinion did not accord the Common Council's decision the presumption of correctness and validity that the law requires, Driehaus v. Walworth Cnty., 2009 WI App 63, ¶13, 317 Wis. 2d 734, 767 N.W.2d 343. Instead, the majority opinion substituted its view of the evidence for that of the Common Council, contrary to law, Clark v. Waupaca Cnty. Bd. of Adjustment, 186 Wis. 2d 300, 305, 519 N.W.2d 782 (Ct. App. 1994).

¶84 I conclude Oneida Seven has failed to meet its burden under certiorari review because a reasonable view of the presentations made March 1, 2011, when Oneida Seven obtained the conditional use permit, supports the Common Council's finding that it was misled. Material misrepresentations were made to the Common Council in regard to emissions during operation of

1

the gasification facility and that such a facility was not experimental because solid municipal waste was being used as the feedstock in other gasification facilities.[1] Therefore, I conclude that substantial evidence supports the Common Council's decision to rescind the conditional use permit. Accordingly, I would reverse the court of appeals decision, affirm the circuit court's affirmance of the Common Council decision, and respectfully dissent from the majority opinion.

## I. BACKGROUND

¶85 This review focuses on the Common Council's October 16, 2012 rescission of the conditional use permit earlier granted to Oneida Seven because the Common Council found that Oneida Seven's representatives had misrepresented material facts to the Common Council when obtaining the conditional use permit. The Common Council found that the misrepresentations raised public health, safety and general welfare concerns in regard to hazardous emissions produced at the facility and in

---

[1] Feedstock is defined as "any renewable, biological material that can be used directly as a fuel, or converted to another form of fuel or energy product." Biomass Feedstocks, Office of Energy Efficiency & Renewable Energy, www.energy.gov/eere/bioenergy/biomass-feedstocks (last visited March 11, 2015).

regard to the experimental nature of a pyrolytic gasification facility that would convert municipal solid waste into syngas.[2]

¶86 In advance of its March 1, 2011 meeting with the Common Council, Oneida Seven submitted 149 pages of material that discussed various waste-to-energy methods and also provided pictorial representations of the facility it was proposing. Oneida Seven's representatives previously had met with the City of Green Bay's Plan Commission to explain the project.

¶87 At the Common Council meeting on March 1, 2011, Oneida Seven's CEO, Kevin Cornelius, and the project manager, Peter King, made representations in support of the conditional use permit. During those presentations when questioned about emissions, Cornelius said, "there are no smoke stacks in it. For those of us here in Green Bay we know what that means." This was an important representation because smoke stacks are used to disburse emissions that are generated by power plants and other businesses.[3] Cornelius's statement was consistent with the drawings and the power point presentation given to the

---

[2] Gasification is the process of "convert[ing] a solid or liquid product from coal, petroleum residue, biomass, or other materials which are recovered for their energy or feedstock value into a synthesis gas [commonly referred to as syngas] composed primarily of carbon monoxide and hydrogen for direct use or subsequent chemical or physical conversion." 26 U.S.C. § 48B(c)(2).

[3] Questions About Your Community: Power Plant/Industry Smoke Stack Emissions, United States Environmental Protection Agency, www.epa.gov/region1/communities/powerplant.html (last visited March 11, 2015).

Common Council on March 1, which showed no stacks for the proposed facility.

¶88 Cornelius also represented that the proposed gasification facility was not based on new or experimental technology. He said that a system such as was being proposed for Green Bay was operational in California. He explained that he "looked at it, the fact that it was operating in California, that it was permitted there. When we saw it, we knew it was a good system."

## II. DISCUSSION

### A. Standard of Review

¶89 This case presents to us on certiorari review of the Common Council's decision to rescind a conditional use permit it previously issued. We review the Common Council's decision, not those of courts that have considered the Common Council's decision. Bd. of Regents of the Univ. of Wis. v. Dane Cnty. Bd. of Adjustment, 2000 WI App 211, ¶10, 238 Wis. 2d 810, 618 N.W.2d 537. Upon certiorari review, we are limited to deciding whether the Common Council "kept within its jurisdiction, acted according to law, acted arbitrarily or unreasonably, and whether the evidence was such that the [Common Council] might reasonably make the order or determination it made." Cohn v. Town of Randall, 2001 WI App 176, ¶25, 247 Wis. 2d 118, 633 N.W.2d 674.

¶90 In regard to the Common Council's factual findings, we will not disturb them if any reasonable view of the evidence supports them. Kapischke, 226 Wis. 2d at 328. In our review,

4

we accord the Common Council's decision a presumption of correctness and validity. Driehaus, 317 Wis. 2d 734, ¶13.

### B. Certiorari Review

¶91 Before us, Oneida Seven argues only one component of certiorari review: whether the evidence was such that the Common Council might reasonably find it had been misled when it granted the conditional use permit. In order to prevail, Oneida Seven must prove that under no reasonable view of the evidence presented to the Common Council on March 1, 2011, could the Common Council have been misled.

### 1. General principles

¶92 We review the decision of the Common Council, not that of the Plan Commission. I bring this to the fore because the majority opinion rests its affirmance of the court of appeals on an extensive discussion of the decision of the Plan Commission and how the Plan Commission supported the conditional use permit.[4] However, it is the Common Council, and not the Plan Commission, that has the power to issue and to rescind conditional use permits. See McQuillin Mun. Corp. § 29.120 at 148 (3d ed.); Green Bay, Zoning Code § 13-205(5). The Plan Commission makes recommendations to the Common Council, § 13-205(3), and it may hold public hearings at the direction of the Common Council, id. at (4). However, the Common Council had no obligation to accept the recommendation of the Plan Commission, but rather, the Common Council had an obligation to consider

---

[4] Majority op., e.g., ¶¶23, 47, 50-53.

Oneida Seven's request and to make an independent decision on whether to grant the permit. See Town of Brockway v. City of Black River Falls, 2005 WI App 174, ¶24, 285 Wis. 2d 708, 702 N.W.2d 418 (concluding that the City was not bound until the common council decided whether to grant its approval).

¶93 A conditional use permit is not property; it is a type of zoning designation. Rainbow Springs Golf Co. v. Town of Mukwonago, 2005 WI App 163, ¶¶12-13, 284 Wis. 2d 519, 702 N.W.2d 40. As the court of appeals explained, "A zoning designation allows a landowner to use his or her property in certain ways." Id., ¶13. Therefore, how the gasification system will operate is material to the conditional use granted to Oneida Seven.

¶94 As we consider Oneida Seven's objection to the Common Council's rescission as it attempted to protect the health and safety of Green Bay residents, we must decide whether "taking into account all the evidence in the record, reasonable minds could arrive at the same conclusion as the Common Council," i.e., that it was misled when it granted the conditional use permit. See Smith v. City of Milwaukee, 2014 WI App 95, ¶22, 356 Wis. 2d 779, 854 N.W.2d 857 (citation and internal quotation marks omitted); see also Crystal Lake Cheese Factory v. LIRC, 2003 WI 106, ¶27, 264 Wis. 2d 200, 664 N.W.2d 651) (explaining that "[t]he reviewing court may not substitute its judgment for that of an agency").

¶95 In evaluating the evidence, we give the Common Council's decision a presumption of correctness and validity because doing so "recognizes that locally elected officials are

6

especially attuned to local concerns." Ottman v. Town of Primrose, 2011 WI 18, ¶51, 332 Wis. 2d 3, 796 N.W.2d 411. In the case before us, the locally elected Green Bay Common Council was concerned about the health and safety of Green Bay citizens.

¶96 A misrepresentation is a statement of fact. Tietsworth v. Harley-Davidson, Inc., 2004 WI 32, ¶13, 270 Wis. 2d 146, 677 N.W.2d 233. Here, we review the Common Council's findings of fact that misrepresentations were made to it when Oneida Seven obtained the conditional use permit. Because a court in certiorari review may not substitute its view of the evidence for that of a common council, we sustain a common council's finding that it was misled unless no reasonable view of the evidence will sustain that finding. Ottman, 332 Wis. 2d 3, ¶53.

¶97 During certiorari review, we do not evaluate evidence to determine whether it could support Oneida Seven's position. However, that is exactly what the majority opinion has done: it has evaluated evidence to determine whether it could support Oneida Seven's position.

## 2. Rescission

¶98 The Common Council rescinded the conditional use permit because it found that it was misled in regard to the project's effects on "public safety and health."[5] The Common Council's concerns were linked to representations in regard to emissions and in regard to the experimental nature of

---

[5] October 16, 2012 statement of Alderman Sladek.

7

gasification facilities that use solid municipal waste as the feedstock for energy generation.

¶99 Although the Common Council asserts that Oneida Seven misled it when obtaining the conditional use permit, the Common Council does not make a claim for actionable misrepresentation; but rather, the Common Council relies on misrepresentation as the equitable basis for its rescission of the conditional use permit.[6]  See Schnuth v. Harrison, 44 Wis. 2d 326, 337, 171 N.W.2d 370 (1969) (explaining that misrepresentation can be grounds for rescission).

¶100 In regard to emissions, the Common Council identified representations that it asserts were false:  First, Cornelius said that there would be no harmful emissions because all of the toxins would be scrubbed out of the syngas and would not be present in the greywater that resulted from that scrubbing. However, contrary to its position before the Common Council, on April 22, 2011, less than two months after it had secured the conditional use permit, Oneida Seven submitted to the DNR an "air pollution control permit application and plans and specifications," in which Oneida Seven requested permission to emit toxic materials.  Furthermore, on September 9, 2011, the DNR issued a permit for Oneida Seven's release of

---

[6] Rescission is an equitable remedy.  Little v. Roundy's, Inc., 152 Wis. 2d 715, 722, 449 N.W.2d 78 (Ct. App. 1989).

dioxins/furans,[7] cadmium, lead, mercury, hydrogen chloride, nitrous oxides, sulfur dioxide,[8] "fugitive ash," and formaldehyde. Limitations for those emissions were listed in the DNR permit.

¶101 Second, Cornelius said the facility would have "no smoke stacks." Both the pictures and the power point presentation provided to the Common Council on March 1, 2011, showed no stacks of any type. The representation that there would be no stacks supported the representation that no toxins would be dispersed into the air because all toxins would be washed out in the internal scrubbing process. However, on September 9, 2011, the DNR approved Oneida Seven's facility with 7 stacks (three 60 feet tall; three 40 feet tall; one 45 feet tall). Stacks were required by the DNR to disperse toxins that Oneida Seven's gasification facility will generate.[9]

---

[7] "Dioxins are highly toxic and can cause reproductive and developmental problems, damage the immune system, interfere with hormones and also cause cancer." Dioxins and Their Effects on Human Health, World Health Organization site www.who.int/mediacentre/factsheets/fs225/en (last visited March 11, 2015).

[8] Sulfur dioxide ($SO_2$) has the smell of "rotten eggs." "Current scientific evidence links short-term exposures to $SO_2$, ranging from 5 minutes to 24 hours, with an array of adverse respiratory effects including bronchoconstriction and increased asthma symptoms. These effects are particularly important for asthmatics." Environmental Protection Agency site www.epa.gov/oaqps001/sulfurdioxide/health.html (last visited March 11, 2015).

[9] Original DNR Air Permit, R.13, Bates Stamps OSGC286-327 (Sept. 9, 2011).

¶102 Third, Cornelius repeatedly represented that this gasification facility would not be experimental because other gasification facilities used municipal solid waste as feedstock to generate syngas. He represented that a facility such as Oneida Seven was seeking was operational in California. He said, "[we] looked at it, the fact that it was operating in California, that it was permitted there. When we saw it, we knew it was a good system." As it turns out, there was no facility in the United States that used only municipal solid waste as the feedstock to generate syngas, which is the system Oneida Seven proposed.

¶103 On October 16, 2012, after gathering information subsequent to issuing the conditional use permit, the Common Council reviewed whether it had been misled by the representations Oneida Seven made, and Alderman Sladek moved to rescind the conditional use permit based on misrepresentations. Most of his concerns were directed at the statements of Kevin Cornelius. He said that Cornelius's statements "were plain spoken statements, they contained no equivocation."[10] Alderman Sladek said that when Common Council members "asked about emission, and chemicals, and hazardous materials at this project, Kevin Cornelius provided false information" on subjects of "very high importance."[11]

---

[10] October 16, 2012 statement of Alderman Sladek.

[11] Id.

10

¶104 Alderman Nicholson remembered "Mr. Cornelius stated that there was going to be a closed system, no emissions. Over months, all of [a] sudden there's going to be emissions, and it's not going to be a closed system."[12]

¶105 The record of the March 1, 2011 Common Council meeting shows that Alderman Nicholson's recollection is correct. First, Cornelius said, "there are no smoke stacks in it. For those of us here in Green Bay we know what that means. And so, obviously, the system has to be pretty safe, pretty clean for that to happen."

¶106 Cornelius was questioned further. He was asked and he answered:

> Q. Is that true that that exhaust, because all of the treatments you're doing, with the metals and everything that is in there, that the exhaust is actually clean[?]
>
> A. Yes.
>
> Q. And also, relative to wastewater, you do such a good cleaning job that the impurities and everything are taken out of this water before you discharge it[?]
>
> A. Yeah. I've got some technical people (pointing behind him), but it's classified as graywater and just goes into the regular sewer system.

¶107 Alderman DeWane spoke next. He said, "The question here is whether we were told enough . . . . As time went on, things changed drastically. . . . [T]hings changed. Emissions changed. Stacks changed. . . . I know that there is no other

---

[12] October 16, 2012 statement of Alderman Nicholson.

11

plant like this in the United States that burns this waste fuel."[13]

¶108 Substantial evidence in the record supports the Common Council's finding that it was misled when it issued the conditional use permit. A finding on whether Oneida Seven's representatives tried to be misleading is not necessary to support the Common Council's rescission of the conditional use permit. See Whipp v. Iverson, 43 Wis. 2d 166, 168, 168 N.W.2d 201 (1969) (explaining that "[r]escission of a contract in equity may be grounded on misrepresentations not intentionally made").

¶109 The record also shows that the Common Council's concerns for the health and safety of the people of Green Bay were addressed when Cornelius said, "there are no smoke stacks in it. For those of us here in Green Bay we know what that means. And so, obviously, the system has to be pretty safe, pretty clean for that to happen." Smoke stacks are used to expel toxic emissions from power plants, and Green Bay has ample experience with the emissions from power plants and other facilities.[14] That there were no stacks for the proposed

---

[13] October 16, 2012 statement of Alderman DeWane.

[14] "Each year, 48 million tons of toxic mercury alone goes up in the smoke from coal-burning power plants. Mercury is a potent, potentially deadly neurotoxin. Its worst effects are felt by the young, wrecking havoc with the development of children's nervous systems, affecting vision, hearing, speech and motor development. Even the unborn can be poisoned by the mercury in their mother's blood, and one out of 10 women in America has mercury levels high enough to affect the development of an unborn child. In Wisconsin, every single waterway in our
(continued)

facility led to the Common Council's belief that the facility would not produce toxic emissions.

¶110 However, the Common Council's belief conflicts with the DNR's September 9, 2011 determination, wherein the DNR approved the facility if it had seven stacks——three that were 60 feet tall, three that were 40 feet tall, and one that was 45 feet tall. The DNR also listed the toxins that it anticipated would be emitted from the gasification facility——dioxins/furans, cadmium, lead, mercury, hydrogen chloride, nitrous oxides, sulfur dioxide, fugitive ash, and formaldehyde.

¶111 The DNR determination directly conflicts with Cornelius's testimony on March 1, 2011, where he answered a direct question in regard to emissions and toxins:

> Q. Is that true that that exhaust, because all of the treatments you're doing, with the metals and everything that is in there, that the exhaust is actually clean[?]
>
> A. Yes.

Alderman DeWane was correct when he asserted on October 16, 2012, "As time went on, things changed drastically. . . . Emissions changed. Stacks changed." The DNR permit to emit certain levels of toxic chemicals is ample evidence of that change.

---

state is listed as containing unsafe levels of mercury." Melanie G. Ramey, Op-Ed., More Work Needed to Protect Clean Air, The Cap Times, May 4, 2012, http://host.madison.com/news/opinion/column/melanie-g-ramey-more-work-needed-to-protect-clean-air/article_d9b116cc-954b-11e1-ac67-001a4bcf887a.html.

¶112 On certiorari review, the Common Council's finding that it was misled when it issued the conditional use permit is entitled to a presumption of correctness and validity, Driehaus, 317 Wis. 2d 734, ¶13. Furthermore, representations made when the Common Council issued the conditional use permit were such that the Common Council might reasonably rescind the conditional use permit upon recognition of Oneida Seven's misrepresentations. Cohn, 247 Wis. 2d 118, ¶25.

¶113 The majority opinion errs because it substitutes its view of the evidence for that of the Common Council. Clark, 186 Wis. 2d at 305. The majority opinion leads itself astray by searching the record for evidence to support Oneida Seven's position that it did not misrepresent when the conditional use permit was obtained.[15] However, whether there is evidence in the record that cuts against the Common Council's decision is not the test to apply in certiorari review. Rather, Oneida Seven must prove there is no reasonable view of the evidence that supports the action the Common Council took. Smith, 356 Wis. 2d 779, ¶22.

¶114 Oneida Seven has failed to meet its burden. In regard to a reasonable view of the evidence, it is interesting to note that in addition to this dissent, the circuit court also

---

[15] See, e.g., "[T]he documents from the DNR that are in the record support Cornelius's statement that the venturi scrubber would remove toxins from the syngas." Majority op., ¶66. "Mr. Cornelius's statements about the ash being put to beneficial uses are also supported by the DNR and DOE materials." Id., ¶69.

14

concluded that a reasonable view of the evidence supported the Common Council's decision to rescind the conditional use permit. The circuit court explained,

> Cornelius said there are no smokestacks. Obviously, the system has to be pretty safe, pretty clean for that to happen. And in the CUP, as you and I both know, there's drawings that do not indicate any type of smokestack. . . .
>
> The record at 21-122-23 shows a flat roof warehouse building, which I think would lead any reasonable person to believe there are no smokestacks because it's a completely closed loop process. . . . There would be nothing——there would be nothing to associate a smokestack with.
>
> . . . I'm not finding any evidence in this record that would allow a reasonable person to conclude that there would (a) be a smokestack or that (b) there would be a smokestack of this type of dimension, which is required by the DNR. . . .
>
> . . . .
>
> . . . I'm having a difficult time in reconciling statements no stacks and then the DNR permit that says in order to build this facility you must have a 60-foot stack.
>
> And Seven Generation knows they can't do that because someone advised them of the building code that says it can't be higher than 35 feet. . . .
>
> Now we have no idea because there was never any evidence that I can find in the record that the redesigned building is going to work, has been tried and tested. Your client's earlier statement, this isn't new technology, this is done in California, is now inconsistent with the plans that are moving forward, inconsistent with the plans that were originally approved by the City of Green Bay when they issued the CUP.

The circuit court's finding that the evidence reasonably supported the Common Council's decision to rescind the

15

conditional use permit is uncontroverted by the majority opinion.

### III. CONCLUSION

¶115 The majority opinion errs because it did not accord the Common Council's decision the presumption of correctness and validity that the law requires, Driehaus, 317 Wis. 2d 734, ¶13. It substituted its view of the evidence for that of the Common Council, contrary to law, Clark, 186 Wis. 2d at 305.

¶116 I conclude Oneida Seven has failed to meet its burden under certiorari review because a reasonable view of the presentations made March 1, 2011, when Oneida Seven obtained the conditional use permit, supports the Common Council's finding that it was misled. Material misrepresentations were made to the Common Council in regard to emissions during operation of the gasification facility and that such a facility was not experimental because solid municipal waste was being used as the feedstock in other gasification facilities. Therefore, I conclude that substantial evidence supports the Common Council's decision to rescind the conditional use permit. Accordingly, I would reverse the court of appeals decision, affirm the circuit court's affirmance of the Common Council decision, and respectfully dissent from the majority opinion.