¶ 143.
DANIEL KELLY, J.
{dissenting). We are "a government of laws, and not of men."[1] Unless one is trying to obtain a conditional use permit from a municipality's land-use committee, in which case the opposite is true. A government of laws requires us to conform our actions to pre-existing standards with discernible content. A government of men requires us to conform our actions to a governing authority's ad hoc wishes. Because our decision today condones the latter, I respectfully dissent.
¶ 144. AllEnergy Corporation and AllEnergy Silica, Arcadia, LLC (collectively, "AllEnergy") have an interest in a parcel of property in an area zoned to allow non-ferrous mining as a conditional use (I will *390 refer to this property as the AIlEnergy Property[2]). AIlEnergy wishes to mine sand on that property, and so (along with the title owners) filed a conditional use permit application with the Committee. The Committee denied the application, citing the various concerns discussed in the court's opinion.
f 145. Our obligation, in reviewing this case, was to determine whether the Committee properly denied the application. A municipal entity commits reversible error if it exceeds its jurisdiction, incorrectly applies controlling legal principles, acts arbitrarily by exercising its judgment instead of its will, or bases its decision on insufficient evidence. Oneida Seven Generations Corp. v. City of Green Bay, 2015 WI 50, ¶ 41, 362 Wis. 2d 290, 865 N.W.2d 162.
¶ 146. The Committee exceeded its jurisdiction when it took upon itself the task of determining whether a sand mine, as a general proposition, is an appropriate use of the AIlEnergy Property. This is a determination already answered by the Trempealeau County Board, and the Committee had no authority to second-guess the wisdom of its decision. The Committee also acted arbitrarily by failing to apply appropriate pre-existing standards to the specific proposal contained in AllEnergy's application.[3]
*391 I
¶ 147. The Committee exceeded its jurisdiction for the same reason our opinion is in error today. That is, we both failed to account for what a County Board accomplishes when it includes certain conditional uses in a zoning district. Both the Committee and our opinion treat the conditional use as a piece of unfinished zoning business, which the Committee may complete when an owner applies for a permit. But a conditional use is not a loose end. It is a determination that the identified use is compatible with the zoning district, and is subject only to appropriate conditions to control for the potentially hazardous aspects of the specific proposal under consideration.
¶ 148. Our error caused us to review the wrong question. We (and the Committee) inquired into the general advisability of operating a sand mine on the AllEnergy Property. Our duty was to accept the County Board's determination that sand mining, with all the incidents that necessarily accompany such a use, is appropriate on that property. If we had done this, our attention would have been focused where it belongs, to wit, on whether AllEnergy's specific proposal created such hazards that they could not be controlled even with the imposition of appropriate conditions.[4]
*392 A
¶ 149. By juxtaposing "conditional uses" and "permitted uses," we can gain some useful insight into the essential nature of the former. That insight will, in turn, illuminate how the Committee improperly took to itself authority to address a question already answered by the County Board.
¶ 150. The chief characteristic of a permitted use is that it is one to which an owner may put his property as a matter of right. Town of Rhine v. Bizzell, 2008 WI 76, ¶ 19, 311 Wis. 2d 1, 751 N.W.2d 780 ("In general, zoning ordinances provide landowners with permitted uses, which allow a landowner to use his or her land, in said manner, as of right."). Thus, for example, a person desiring to build a residence in a residential zoning district need only comply with whatever parameters may exist in that district (such as density, building size, setbacks, height, etc.). So long as that zoning pertains, and the proposed development does not exceed the district's explicit limitations, the municipality may not deny a building permit.[5]
¶ 151. This is not the case with "conditional uses." As we have said before, a conditional use classification "allows a property owner 'to put his property *393 to a use which the ordinance expressly permits when certain conditions [or standards] have been met.' " Id., ¶ 21 (brackets in original; emphasis added) (quoting State ex rel. Skelly Oil Co. v. Common Council, City of Delafield, 58 Wis. 2d 695, 701, 207 N.W.2d 585 (1973)). Such a classification allows a municipality "to cope with situations where a particular use, although not inherently inconsistent with the use classification of a particular zone, may well create special problems and hazards if allowed to develop and locate as a matter of right in [a] particular zone." Skelly Oil Co., 58 Wis. 2d at 701. The purpose of conditional use classifications, therefore, is to provide for "those particular uses that a community recognizes as desirable or necessary but which the community will sanction only in a controlled manner." Bizzell, 311 Wis. 2d 1, ¶ 20; see also 3 Edward H. Ziegler, Rathkopf's The Law of Zoning and Planning § 61.1 at 61-3 (4th ed. 1993) (stating the purpose of the conditional use classification is to provide "same-site-specific discretionary review of proposed uses that are generally deemed to be presumptively compatible or desirable in a particular area or zoning district."). They are "necessary to the community, but because they often represent uses that may be problematic, their development is best governed more closely rather than as of right." Bizzell, 311 Wis. 2d 1, ¶ 24.[6]
¶ 152. From this we may distill that a conditional use is one a municipality has determined is "desirable" or "necessary to the community" and is not *394 "inherently inconsistent with the use classification of a particular zone . . . Id., ¶¶ 23-24. But it is also one that "may well create special problems and hazards if allowed to develop and locate as a matter of right. . . Id., ¶ 23. So a "conditional use" listing is a declaration that "the community will sanction [it] only in a controlled manner." Id., ¶ 20. The manner in which the community exercises its control is by allowing development to proceed only " 'when certain conditions [or standards] have been met.' " Id., ¶ 21 (quoting Skelly Oil Co., 58 Wis. 2d at 701) (brackets in Bizzell).
¶ 153. This means, of course, that a property owner is not entitled to a conditional use permit as a matter of right. If the use is dependent on satisfaction of "certain conditions or standards," it necessarily follows that property owners have no guarantee a permit will issue. We have previously said as much: " '[T]he designation of a use in a zoning district as a conditional use does not constitute an authorization or assurance that such use will be approved.' " Bizzell, 311 Wis. 2d 1, ¶ 59 (quoting 5 Alan C. Weinstein, Anderson's American Law of Zoning § 34.23, at 573 (4th ed. 1997)).
¶ 154. However, just because a property owner has no guarantee a permit will issue does not mean a municipal committee has free rein to deny an application. One of these propositions is not the negation of the other, and we have been very careful not to say so. For example, in Bizzell we considered whether a municipality could create a zoning district in which there were no permitted uses, only conditional uses. Mr. Bizzell asserted that there must be some use to which a person may put his property as a matter of right. See id., 311 Wis. 2d 1, ¶ 14. The Town of Rhine responded that "conditional uses are permitted uses because once *395 the standards have been satisfied a landowner is 'entitled' to the conditional use." Id., ¶ 55. We rejected that argument as lacking any merit. See id., ¶¶ 55-56. But we did so on the basis that "[p]ermitted uses and conditional uses are different" in large part because there is no absolute right to the latter. Id., f ¶ 55-56 (citing S. Kemble Fischer Realty Trust v. Bd. of Appeals of Concord, 402 N.E.2d 100, 103 (Mass. App. Ct. 1980) (stating that "[n]o one, of course, has an absolute right to a special permit")). We did not say a municipality could deny the application because it does not believe the conditional use is appropriate for the applicant's property. We just affirmed the proposition that there is never an absolute (that is, unconditional) right to a permit.
¶ 155. And in Edward Kraemer & Sons, Inc. v. Sauk County Board of Adjustment, 183 Wis. 2d 1, 515 N.W.2d 256 (1994), we said the court of appeals was mistaken in believing that a "mineral extraction permit had to be granted and if conditions were necessary to ensure compliance with the ordinance, the Board was obligated to fashion them." Id. at 7. But that was in the context of determining who bears the burden of establishing compliance with the municipality's identified standards. See id. at 16-17. We did not say the municipality could deny an application because the proposed use comprised the essential attributes of a mining operation.
1 156. The court of appeals has not been similarly circumscribed. In Delta Biological Resources, Inc. v. Board of Zoning Appeals of Milwaukee, 160 Wis. 2d 905, 467 N.W.2d 164 (Ct. App. 1991), the appellant asserted that "a presumption arises that the use serves the public interest from the fact that the legislature *396 permits it, and the special use[7] itself, therefore, presumes a legislative determination that a public need for the use exists." Id. at 911 (footnote added). From this Delta Biological argued that "because the legislature's provision for a special use exception is a determination that such use does not materially affect the area adversely, denial is proper only upon proof that adverse impact upon public interest is greater than that which might be normally expected." Id. at 912.
f 157. The court of appeals disagreed, stating "[w]e reject Delta's argument because its linchpin, the presumption that the conditional use serves the public interest, does not exist in Wisconsin." Id. The court of appeals accurately identified that argument as the linchpin in determining whether there are circumstances in which a municipality must grant a conditional use permit. See id. at 911—12. What it did not identify is any authority for its surprising assertion that there is no presumption that a conditional use serves the public interest. Nor did it identify any rationale that would make it an accurate description of the state of the law.
¶ 158. Our opinion today recognizes that AllEn-ergy and Delta Biological's arguments share the same linchpin. After quoting Delta Biological's authority-free statement of the law, it concludes that "our precedent dictates that no presumption exists that a conditional use is ipso facto consistent with the public interest or that a conditional use is a use as of right. . . Lead op., f 55. The latter part of the quote *397 is not material to the analysis because no one equates conditional uses and uses as of right. But whether a "conditional use is ipso facto consistent with the public interest" is a question of the greatest moment here. Indeed, AllEnergy's case succeeds or fails based on whether Delta Biological answered that question correctly.
¶ 159. Delta Biological's answer is not correct. Bizzell—a supreme court decision considerably more recent than Delta Biological—teaches that a conditional use is one a municipality has determined is "desirable" or "necessary to the community," and is not "inherently inconsistent with the use classification of a particular zone . . . ." See Bizzell, 311 Wis. 2d 1, ¶¶ 23-24. It also tells us that when a community identifies a "conditional use" with a property, it is sanctioning that use so long as it is done "in a controlled manner." See id., ¶ 20. This description of conditional uses is entirely inconsistent with the court of appeals' statement that "the presumption that the conditional use serves the public interest [] does not exist in Wisconsin." See Delta Biological, 160 Wis. 2d at 912. We should not assume that a municipality would "sanction" a use that is contrary to the public interest. And the principle of non-contradiction should prevent us from concluding that a use that is "desirable" or "necessary to the community" can somehow simultaneously not serve the public interest.
¶ 160. This places substantial limitations on the reasons a municipality can give for denying a conditional use permit. Because the types of uses identified as conditional uses are "sanctioned," and either "desirable" or "necessary to the community," an application for such a use may not be denied because the owner proposes to engage in that type of use. That is to say, if *398 an ice-cream shop is a conditional use, a land-use committee may not deny a permit because the committee's members object to the owner selling ice-cream on his property. Such objections are in order when the municipality adopts (or amends) its zoning ordinance and considers which conditional uses (if any) to include in each of its zoning districts. Upon adding a conditional use to a zoning district, the municipality rejects, by that very act, the argument that the listed use is incompatible with the district. See, e.g., People's Counsel v. Mangione, 584 A.2d 1318, 1322-23 (Md. Ct. Spec. App. 1991) (explaining that a zoning ordinance providing for a special exception is a legislative predetermination that such special exception, subject to certain guides and standards, is compatible with other uses identified for that zone); State ex rel. Straatmann Enters., Inc. v. Cty. Of Franklin, 4 S.W.3d 641, 650 (Mo. Ct. App. 1999) (explaining that a conditional use is one authorized by a local legislative body that, in the absence of having met certain conditions, may otherwise be incompatible with the location).
f 161. An application for a conditional use permit is not an invitation to re-open that debate. A permit application is, instead, an opportunity to determine whether the specific instantiation of the conditional use can be accomplished within the standards identified by the zoning ordinance. See, e.g., Matter of Cove Pizza v. Hirshon, 61 A.D.2d 210, 212—13 (N.Y. App. Div. 1978) (where a special use ordinance allows for certain types of restaurants, board cannot deny application because it objects to the allowed special use). A land-use committee, therefore, must focus on the owner's specific proposal and determine whether that proposal can be made compatible with the zoning ordinance's standards. See, e.g., id.; see also DeMaria v. *399 Enfield Planning and Zoning Comm'n, 271 A.2d 105, 106-08 (where zoning ordinance provides for special use and identifies requirements for obtaining such permit, board cannot deny application because it does not like the esthetic effect of the proposed apartment complex or because the board does not believe the proposal presents a satisfactory image of what apartments in the town should look like).
B
¶ 162. Our decision today would look considerably different if we had taken our guidance from Bizzell instead of Delta Biological. The logic behind Bizzell teaches us that (as relevant here) testimony related to a proposed use of property has two distinct functional purposes depending on the stage of the zoning process in which it is offered. One stage relates to a municipality's adoption or amendment of a zoning ordinance. The other relates to the consideration of an owner's application for a use permit.
¶ 163. When the Trempealeau County Board writes its zoning code, or considers amendments, the testimony it needs, and is appropriate to consider, is whether a type of use is compatible with a designated zoning district. This is the stage at which the County has the greatest discretion in determining what may, and may not, be allowed on various tracts of property. See Wis. Stat. § 59.69(13) ("The powers granted in this section shall be liberally construed in favor of the county exercising them . . . ."); see also Cohen v. Dane Cty. Bd. of Adjustment, 74 Wis. 2d 87, 90, 246 N.W.2d 112 (1976). It is also the stage at which it is necessary to draw most deeply on the wisdom, experience, and discretion of the community and its representatives. *400 The community's testimony plays a key role in answering these land-use questions wisely.
¶ 164. Once the County adopts its zoning code, however, testimony about a proposed use has a narrower function. Its purpose is to help the Committee determine whether the proposal satisfies the parameters already adopted by the Trempealeau County Board. And when the testimony relates to a "conditional use," its function is to provide the information necessary to determine what conditions to impose on the use.[8] In making this determination, the Committee must interpret and apply the zoning code with a bias towards the free use of property. See, e.g., Cohen, 74 Wis. 2d at 91 (zoning ordinances are to be construed "in favor of the free use of private property.").
1
f 165. Consequently, the zoning ordinance's terms inform the Committee of both the scope of its discretion, as well as the type of testimony on which it may rely in considering an application for a conditional use permit. The AllEnergy Property bears the EA-2 zoning designation, which Trempealeau County describes as follows:
This district preserves class I, II and III soils and additional irrigated farmland from scattered residential developments that would threaten the future of agriculture in Trempealeau County. The district is also established to preserve woodlands, wetlands, natural areas and the rural atmosphere of the County. .. .
*401 Trempealeau County, Wis., Zoning Ordinance § 2.03(2). Chapter 13 of Trempealeau County's zoning ordinance makes non-ferrous mineral mining a conditional use in the EA-2 district:
Non-metallic mining is a conditional use of land in the EA, EA-2, PA and TA districts. In addition to taking into consideration the general criteria governing the granting of conditional use permits -under Sec. 10.04, the County shall specifically analyze non-metallic mineral mining proposals in light of the County's interest in providing for the wise use of the natural resources of the county, aesthetic implications of the siting of such a mine at a given location and the impacts of such a mining operation on the general health, safety and welfare of the public. Each application shall be judge on its own merits. Subject only to the standards set forth in this section and in the zoning ordinance as a whole, it is impossible to prescribe the criteria upon which such a permit may be granted in each and every case.
Trempealeau County, Wis., Zoning Ordinance § 13.01.[9]
¶ 166. Bizzell says these zoning provisions establish that the Trempealeau County Board has legislatively determined that sand mining is not inherently inconsistent with the EA-2 zoning district. See id., 311 Wis. 2d 1, ¶ 23. Bizzell also says we must conclude from these provisions that sand mining is a type of use sanctioned by the County Board and deemed desirable, or necessary to the community, in this district. See id., ¶ 24.
¶[ 167. Presumably, when the members of the Trempealeau County Board authorized non-ferrous *402 mineral mining as a conditional use of the AllEnergy Property, it knew at least the basics about the type of activity it was designating as sanctioned and either necessary or desirable. I trust the members would not be surprised to learn that sand mining will change the topography of the property, alter the course of surface waters, create dust, make the property unavailable for agricultural uses (at least until remediation and maybe thereafter), and not contribute to scenic beauty.
¶ 168. These are expected and necessary consequences of sand mining, and are baked into the County Board's decision that sand mining should nonetheless be allowed on the AllEnergy Property, subject only to appropriate conditions. Just as a municipality may not deny a conditional-use application for an ice-cream parlor because the owner intends to have ice-cream on the premises, the Committee may not deny AllEnergy's application because his proposed use will comprise the essential characteristics of a sand mine.
¶ 169. The people of Trempealeau County should be congratulated on their interest in, and concern for, their community. The testimony they offered was, for the most part, relevant, instructive, and trenchant. Some of it, however, related to the wisdom of the Trempealeau County Board's determination that sand mining is a sanctioned and desirable or necessary use in AllEnergy's zoning district.
¶ 170. Thus, for instance, various community members objected to AllEnergy's proposal because it would affect the landscape, detract from scenic beauty, impact the conservation of natural resources, or eliminate their pastoral lifestyle. Members of the Committee raised similar concerns. Committee member George Brandt rejected AllEnergy's application, in part, because of "the significant change to the land *403 scape and to the local cultural and social conditions." Committee member Ed Patzner frankly stated a sand mine is not compatible with this zoning district:
Well, I represent the Farm Service Agency and I'm for agriculture. Agriculture has a history of bringing stability and jobs to our local economy, where sand mines have a history of boom or bust on the local economy, therefore destroying good productive agricultural land is not a wise decision. We don't want to destroy our outdoor recreation potential, like hunting, biking and other activities that attract visitors, retirees and people that love scenic beauty who are close to work and live here.
Committee member Jeff Bawek was no less blunt in his conclusion that a sand mine simply does not belong on the AllEnergy Property:
Based on information given as referenced and my own findings, along with public concerns given at this meeting, this siting does not seem to be in the best interest of our citizens nor in the best use of our natural resources of Trempealeau County .... Trout Run Creek and the close proximity to the Trempealeau River deem this site as poor.
¶ 171. All of this testimony, and the concerns raised by the Committee members, appear to be well-founded and offered in good faith. But it is also all directed at a question they had no authority to address. Trempealeau County has legislatively disagreed with Mr. Bawek on whether a sand mine on the AllEnergy Property is in the best interest of the community, or is a "poor" site. Also, we should presume the County was aware of the relative economic benefits of mines and farms (as described by Mr. Patzner). But the County legislatively disagreed with him as well. So, too, with Mr. Brandt's concern about the cultural *404 and social implications of developing a mine on the AllEnergy Property. And the County surely knew, when it decided that a mine would be a necessary or desirable use of the AllEnergy Property, that it would change the landscape, be less attractive, and affect natural resources and recreational activities.
f 172. The County knows a sand mine will do and be all these things, but nonetheless declared them unobjectionable on the AllEnergy Property. So although the testimony and concerns described above are valid, they should have been raised when the County was developing its zoning ordinance in the first place. When, as here, the task is to apply the zoning decisions already made to a conditional use permit application, the Committee lacks authority to second-guess the County Board's legislative decisions.
2
f 173. Whether the specific attributes of AllEn-ergy's proposed mining operation would comply with all the necessary criteria upon which a permit may be conditioned is a question of an altogether different nature. Here, the Committee's specific task was to decide whether the imposition of an appropriate set of conditions could sufficiently control for the "special problems and hazards" this type of use presents. See Bizzell, 311 Wis. 2d 1, f 23; see also Halfway House v. City of Waukegan, 641 N.E.2d 1005 (Ill. App. Ct. 1994) (city could impose reasonable conditions such as limiting halfway house to 32 residents); Council Rock Sch. Dist. v. Wrightstown Twp. Zoning Hearing Bd., 709 A.2d 453 (Pa. Commw. Ct. 1998) (special exception uses may require imposition of "reasonable conditions for the protection of the health, safety, and welfare of the community which the applicant must meet"). The *405 community's concerns about AllEnergy's specific implementation of that use are not only relevant, they are critical to the Committee's deliberations over the permit application.
¶ 174. Although the community offered a wealth of information relevant to this task, the Committee used it for the wrong purpose. It should have used the testimony to determine what specific standards AllEn-ergy would be required to satisfy before obtaining a sand mining permit. Instead, the Committee used the testimony to address a question already answered by the Trempealeau County Board, to wit, whether it would be advisable to operate a sand mine on the AllEnergy Property. That is a legislative determination already settled by § 13.01 of the zoning code, and the County Board settled it in AllEnergy's favor.
| 175. The mismatch between the community's testimony and the question the Committee answered becomes incandescent upon review of the Committee's justification for denying AllEnergy's application. Community members offered heartfelt and reasoned input on the proposed mine's impact on nearby Trout Run Creek and associated wetlands, surface water drainage, the health effects of wind-borne dust, the potential consequence of flooding in the vicinity, water quality, and the continued viability of various ecosystems. As the court's opinion demonstrates, each of these topics relates to standards the zoning code requires the Committee to consider in ruling on AllEnergy's application.
¶ 176. But the Committee did not use the testimony to determine what conditions it might be necessary to impose on AllEnergy's planned use. It instead acted as though it was determining, in the first in *406 stance, whether sand mining was compatible with the AllEnergy Property. Committee member Kathy Zeglin, for instance, said she had
numerous environmental concerns about the significant wetlands in the area, the river at this point historically was and is constantly changing it is very hard to plan anything on a long range basis. I'm very concerned with the water table in the area—it is very high. I haven't been convinced that it will not be disturbed.
Committee member George Brandt expressed similar concerns:
[T]he possibility of possible significant danger to ground water, by processes involved in mining and processing, and the high capacity well.... [W]etland location is too close to sensitive water and wildlife resources and number 2 is the possibility of significant damage to groundwater by processes involved in mining and high capacity well.
Committee member Ed Patzner noted "[t]here are health concerns with mining so we need to protect our residents." And finally, Committee member Jeff Bawek observed that "[s]oil around and in the site bring into question the potential for water problems."
¶ 177. Each of these concerns is entirely legitimate. And if the Committee had the authority to determine whether sand mining should be listed as a conditional use in the zoning district encompassing the AllEnergy Property, perhaps this would have led them to say "no." But that was not its duty, and in acting as though it was, it exceeded its jurisdiction and usurped the Trempealeau County Board's authority to answer that question.
*407 I—I I—I
¶ 178. There is some disagreement about how specific an ordinance governing issuance of conditional use permits must be to prevent arbitrary decision-making. We have recognized that they at least "must be sufficiently specific ... to allow for judicial review." Bizzell, 311 Wis. 2d 1, ¶ 21 n.9 (citing 3 Kenneth H. Young, Anderson's American Law of Zoning § 21.09, at 709 (4th ed. 1996) (discussing the specificity of standards)). An ordinance does not satisfy this requirement if it " 'fails to provide suitable standards where it confers on a board [ ] "unlimited discretion to condition the issuance of the permit on the basis of such norms or standards as it may from time to time arbitrarily determine." '" Bizzell, 311 Wis. 2d 1, ¶ 21 n.9 (citing 3 Young at 711). Some courts strike ordinances as insufficiently specific when they simply require that the conditional use be in the "public interest," promote the "general welfare," or are " 'consistent with the purpose or intent of the zoning ordinance.'" Bizzell, 311 Wis. 2d 1, ¶ 21 n.9 (quoting Daniel R. Mandelker & Michael Allan Wolf, Land Use Law § 6.03, at 6-6 (5th ed. 2003) (one set of quotations omitted); see, e.g., Clark v. Bd. of Appeals, 204 N.E.2d 434 (Mass. 1965) (rejecting zoning ordinance as too broad); Fitanides v. Crowley, 467 A.2d 168 (Me. 1983) (finding portion of zoning ordinance unconstitutional because it did not provide the board with "specific guidelines that allow the board to determine what special characteristics of a proposed use render it detrimental to the public health, safety or general welfare of the neighborhood."). Others uphold similar ordinances, citing the need for flexibility in the administration of conditional use permits. Bizzell, 311 Wis. 2d 1, ¶ 21 n.9; see, e.g., Burrell v. Lake Cty. Plan Comm'n, 624 N.E.2d 526 (Ind. Ct. App. 1993) (conclud *408 ing that that the complained of "health, safety, and general welfare standard" was not improper); Schultz v. Bd. of Adjustment, 139 N.W.2d 448 (Iowa 1966) (concluding that a general zoning ordinance was "constitutionally adequate and [gave] reasonably sufficient guidelines governing the grant or denial of a conditional use permit for operation of a sanitary landfill.").
¶ 179. The court's opinion today identifies a lengthy list of standards AllEnergy must navigate en route to issuance of a conditional use permit. Some are relatively specific.[10] Others are as broad as those struck down in other jurisdictions.[11] There may be *409 legitimate debate about where to place each of these standards on the continuum between "sufficiently specific" and "unbridled discretion." But there should be no debate that an explicit refusal to identify all of the applicable standards rings the "unbridled discretion" bell, and smartly.
¶ 180. Whatever success Trempealeau County may have in convincing us its standards are sufficiently specific, it forfeits by giving itself an escape hatch so generous it makes the standards superfluous. As our decision today acknowledges, the Committee "is not limited to considering the factors specified in the ordinance." Lead op., f 41. Instead, it may look to "additional factors as are deemed by it to be relevant to its decision making process." Trempealeau County, Wis., Zoning Ordinance § 10.04(5)(b). This is not an isolated sentiment—the County is committed to not letting the listed standards cabin its discretion: "Subject only to the standards set forth in this section and in the zoning ordinance as a whole, it is impossible to prescribe the criteria upon which such a permit may be granted in each and every case." Trempealeau County, Wis., Zoning Ordinance § 13.01.
f 181. So the County reserves to itself the right to make up the standards as it goes along. But the whole point of requiring a set of knowable standards is *410 to limit the bases on which the County may deny a permit. As we noted in Bizzell, a zoning ordinance may not confer on the County "unlimited discretion to condition the issuance of the permit on the basis of such norms or standards as it may from time to time arbitrarily determine." Id., 311 Wis. 2d 1, ¶ 21 n.9 (quoting 3 Young, § 21.09 at 711) (internal marks omitted). This unbridled discretion soundly defeats any attempt at judicial review. If the Committee may announce a standard at the same time it rules the applicant failed to satisfy it, what are we to review? How closely the post hoc standard conforms to the evidence it was designed to match? That's a rhetorical inquiry, not judicial review.
f 182. Ultimately, creating standards at will gives rise to the same problem as the vague "wisdom" and "public interest"-type standards. It forces permit applicants to play the "guess what's in my head" game with the Committee. AIlEnergy consulted the ordinances in an attempt to discern what standards its application must satisfy to get a conditional use permit from the Committee. At the hearing, it listened as the Committee members touched the ordinance talismans before voting against the application. It learned the Committee members had concerns about a sand mine's effect on wetlands, trout streams, soil, beauty, recreation, topography, culture, and farming (to name a few). What it did not learn was anything about why the Committee members thought AllEnergy's specific proposal would immanentize their concerns. Just as it had to guess at what might cause the Committee to deny the application while drafting it, AIlEnergy must now retrospectively guess at what could be done to allay the members' inchoate fears.
*411 ¶ 183. Not coincidentally, that is also what we must do. The thing we are supposed to review is still secreted away in the Committee members' minds. The generalized concerns they expressed certainly track the ordinance's language, but our job is not to evaluate whether they can repeat that language while denying an application. It is to determine whether the Committee properly measured AllEnergy's specific proposal against knowable and certain standards, and then determined whether the imposition of appropriate conditions would allow implementation of the proposal while simultaneously protecting the public's legitimate interests. Only the Committee members can know whether they did this, because no evidence of it made its way into the record.
¶ 184. A proper record, and proper exercise of discretion, would demonstrate the Committee actually engaged with the specifics of AllEnergy's proposal, and then determined whether appropriate conditions would protect against the hazards of this type of conditional use. So for example, after identifying that sand mines in general might threaten Trout Run Creek and surrounding wetlands, the Committee should have informed AllEnergy of the nature of the threat it feared and given it an opportunity to develop an alleviating condition. Flooding is apparently a recurrent event in this area, so the Committee could have, and should have, required AllEnergy to develop a condition that would control for such an eventuality. Blowing dust consequent upon sand mining potentially has adverse health effects, so the Committee should have required AllEnergy to quantify the problem and propose a condition to address it. And so on with each of the specific issues raised by the commu *412 nity or Committee members. This is the Committee's core function, and it was left undone.
f 185. Because the Committee did not complete its assigned task, its decision to reject AllEnergy's application reflects an exercise of will, not judgment. "Judgment" would have been the result of applying the standards already adopted by the Trempealeau County Board to the facts presented by AllEnergy's application, including the determination that sand mining at this location is sanctioned and either necessary or desirable. But the Committee jettisoned those standards. And with respect to the exceedingly vague "public interest" and "wisdom" standards, it required AIlEnergy to guess at what specific aspects of a sand mine would cause concern for its members. And then it required AIlEnergy to guess at what might be necessary to allay those concerns. Wherever the arbitrary and capricious line might lie, "Guess what's in my head" certainly falls on the wrong side of it.
f 186. Because of this, we (along with AIlEn-ergy) must guess at whether the imposition of conditions on AllEnergy's proposed sand mine would be capable of properly controlling the hazards incident to such a use. So our decision today does not actually review whether the Committee properly considered an application for a conditional use permit. It reviews whether the Committee expressed sufficient misgivings about mining for sand on the AIlEnergy Property. Because the Committee addressed itself to a question outside its jurisdiction, and because its failure to complete its task made its decision arbitrary and capricious, we should have reversed the decision and remanded for further proceedings. Because we did not, I respectfully dissent.
*413 ¶ 187. I am authorized to state that Justices MICHAEL J. GABLEMAN and REBECCA GRASSL BRADLEY join this dissent.

 J. Adams, 4 Life and Works of Johns Adams 99, 106 (1851) (Novanglus Letter No. VII) (referring to the definition of a "republic" as understood by Aristotle, Livy, and Harrington).

 AllEnergy's application for a conditional use permit identifies Gary Haines, Cortland Farm LLC, and Francis Pron-schinske as the title owners of the property.

 This is not to say, however, that I believe the record is sufficiently developed to conclude that the Committee should have issued the conditional use permit. Because the Committee did not complete its assigned task, as I discuss below, the proper course would be to remand the matter to the Committee for further proceedings.

 The concurring opinion says the "disposition of this case is appropriate when one recognizes that decisions of the type made by the Committee involve 'local concerns' best handled at the local level." Concurrence, ¶ 136. This is a category error. The "localness" of the governmental body making the decisions has absolutely nothing to say about whether it made them correctly. The rule of law does not lose its grip as the scope of the governmental body scales down. The smallest unit of government owes the same duty as the greatest: To conduct itself according to law. We defer to a local government's policy *392 decisions because they are outside the remit of the judiciary, but the legality of its decisions never is. So to suggest the disposition of this case has anything to do with the level of government making the decision is to miscategorize the nature of our inquiry.

 "Permissible uses are by-right uses, i.e., the uses are named in the zoning ordinance and a property owner has the right to establish the use so long as it conforms to the standards and criteria of the zoning ordinance." Town of Rhine v. Bizzell, 2008 WI 76, ¶ 50, 311 Wis. 2d 1, 751 N.W.2d 780 (internal marks omitted).

 "Current zoning journals also support the conclusion that the common, accepted zoning practice is to provide permitted uses as of right and then, in addition to permitted uses, the ordinance may provide for conditional uses." Bizzell, 311 Wis. 2d 1, ¶ 50.

 "Special use" is synonymous with "conditional use." See, e.g., Bizzell, 311 Wis. 2d 1, ¶ 20 ("ordinances may also provide for conditional uses by virtue of a special use or conditional use permit.").

 It is conceivable that there could be no set of conditions sufficient to control the potential adverse impacts of a specific instantiation of a conditional use. However, the Committee did not suggest that was the case, so this proposition needs no further consideration here.

 I cite to Trempealeau County, Wis., Zoning Ordinance § 13.01 as it existed at the time AllEnergy filed its conditional use application. That zoning ordinance, however, has since been amended. All references to § 13.01 in this dissent are to the version existing at the time AllEnergy filed its application.

 For example, Trempealeau County Zoning Ordinance § 10.04(5)(b) requires the Committee to consider, amongst other criteria:
1. Whether the proposed project will adversely affect property in the area.
2. Whether the proposed use is similar to other uses in the area.
3. Whether the proposed project is consistent with adopted Trempealeau County plans or any officially adopted town plan.
[[Image here]]
7. Whether the proposed use creates noise, odor, or dust.
[[Image here]]
11. Provision for proper surface water drainage.
[[Image here]]
13. Whether the proposed project creates excessive exterior lighting glare or spillover onto neighboring properties.
[[Image here]]
16. Whether the proposed project would adversely affect any historic or archeological sites.

 The Committee must assess an application for a sand mining permit "in light of the County's interest in providing for *409 the wise use of the natural resources of the county, aesthetic implications of the siting of such a mine at a given location and the impacts of such a mining operation on the general health, safety and welfare of the public." Trempealeau County, Wis., Zoning Ordinance § 13.01. Nor may the Committee issue a conditional use permit unless it first determines "the proposed use at the proposed location will not be contrary to the public interest and will not be detrimental or injurious to the public health, public safety, or character of the surrounding area." Trempealeau County, Wis., Zoning Ordinance § 10.04(5)(a).